UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIS K. BAIRD, JR.,

        Plaintiff,

    v.                                        Case No. 18-cv-894-pp

IRIS USA, INC.

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 27) AND DISMISSING CASE

Willis Kevin Baird, Jr., worked at IRIS USA, Inc. from June 2015 until October 2016. In June 2018, Baird (representing himself) filed this lawsuit against IRIS under Title VII of the Civil Rights Act of 1964, alleging workplace discrimination (the plaintiff is African American), retaliation (for prior discrimination complaints) and hostile work environment (raced-based and retaliatory). The defendant has moved for summary judgment on all the plaintiff's claims, arguing that many allegations exceed the scope of his prior discrimination complaints, that other allegations do not constitute materially adverse employment actions and that the remaining allegations are either time-barred or fail on their merits. The court agrees with all three arguments, grants the defendant's motion and dismisses the case.

# I. Facts

In opposing the defendant's motion for summary judgment, the plaintiff did not reproduce each numbered paragraph in the defendant's statement of proposed facts, as required by Civil Local Rule 56(b)(2)(B)(i) (E.D. Wis.). The plaintiff admits that several facts are undisputed. <u>See</u> Dkt. No. 38 at 1, 12. He claims that other material facts are in dispute, but his responses are either completely lacking, not supported by any evidence or not supported by admissible evidence. <u>See</u> <u>id.</u> at 1–12. The defendant's proposed facts, therefore, are largely undisputed. <u>See</u> Fed. R. Civ. P. 56(c); Civil L.R. 56(b)(4). The court takes the facts in this section from the defendant's statement of proposed material undisputed Facts, dkt. no. 29; and the plaintiff's sworn complaint, dkt. no. 1, which the court construes as an affidavit for purposes of summary judgment, <u>see</u> <u>Beal v. Beller</u>, 847 F.3d 897, 901 (7th Cir. 2017).

## A. <u>Background</u>

IRIS USA, Inc. is a leading manufacturer of home and office products, specializing in high-quality plastic storage products. Dkt. No. 29 at ¶1. In June 2015, the plaintiff began working at IRIS's manufacturing facility in Pleasant Prairie, Wisconsin, through a temporary staffing agency. <u>Id.</u> at ¶¶1-2. The plaintiff was assigned to work third shift under the direct supervision of Ashley Greene (Production Supervisor), who is biracial.[1] <u>Id.</u> at ¶¶10-11; Dkt. No. 1 at 4, 8. During the plaintiff's first week on the job, one of his co-workers, John

---

[1] Greene's mother is Caucasian and her father is African American. Dkt. No. 38 at 12.

Knue (Caucasian), repeatedly called him "Hershey"—which the plaintiff took as a reference to his chocolate-brown skin color. Dkt. No. 1 at 4, Dkt. No. 29 at ¶15. The plaintiff reported the incident to Greene, but she just laughed it off. Dkt. No. 1 at 4.

After completing his ninety-day temporary assignment, the plaintiff applied for a permanent position with IRIS. Dkt. No. 1 at 4. His application emphasized his college education and desire to advance in the company. Id. at 4-5. In September 2015, IRIS hired the plaintiff as a Machine Employee, and he worked third shift under Greene. Dkt. No. 29 at ¶¶1, 10; Dkt. No. 1 at 4. Machine Employees work on plastic injection molding and other machines that manufacture IRIS's plastic storage products. Id. at ¶12.

Hourly employees who demonstrate proficiency and meet IRIS's job expectations generally will receive pay and position increases (*i.e.*, promotions) after a certain amount of time in each position. Id. at ¶13. For example, Machine Employees can advance to higher levels in the position family, such as Machine Employee 1, 2 and 3, and then to Machine Assistant Lead (or "Line Lead") 1 and 2. Id. Production Supervisors, like Greene, also can select a Machine Employee to train for Line Lead. Id. Line Lead trainees do not receive an increase in pay during the training period, and training does not guarantee a promotion. Id.

B.    The Plaintiff's March 2016 allegations and IRIS's investigation

According to the plaintiff, in October 2015, Greene told him that she would only date white or Hispanic men and that black men were "too hard to

3

control." Id. at ¶40 (quoting Dkt. No. 31-1 at 36–37). The plaintiff further claims that on March 9, 2016, in reference to a workplace disagreement between him and Knue, Greene told the plaintiff, "John is a little white boy, if you would have talked to a black guy like you did John, yall would be fighting." Dkt. No. 39-1 at 13–14; see also dkt. no. 29 at ¶40 (quoting Dkt. No. 31-1 at 35–36). Greene denies ever calling an employee "a little white boy." Dkt. 29 at ¶41.

On or around March 9, 2016, Greene reported to Shoko Gerritts (Employee Relations Manager) that the plaintiff had engaged in and had several altercations with his third-shift co-workers, to the point that other employees on the shift no longer wished to work with him. Id. at ¶16. A few days later, the plaintiff filed a grievance alleging that Greene engaged in racial discrimination (including by choosing only white employees for training and promotions), sexual harassment, unlawful drug use, abusive behavior, favoritism and violations of company policies. Id. at ¶17; Dkt. No. 39-1 at 11–23.

The plaintiff alleged that he was retaliated against in the days following his grievance against Greene. He claims that Greene made Brian Smith (Plant Engineer) Third-Shift Supervisor for one night and had Smith follow the plaintiff around, write a negative supervisory report about the plaintiff and threaten to call Richard Gerritts (Production Manager) and have the plaintiff fired. Dkt. No. 1 at 28–29. The plaintiff further claims that Greene assigned him to a machine three days in a row that causes severe pain to the operator's hands and fingers; instructed him to put on a shirt that complied with the

4

company's attire policy; refused to inform him that Clara "Doe" in Shipping and Receiving had requested him for overtime work; and gave him his first "2" (out of "5") in one area on his performance evaluation. See Dkt. No. 1 at 10–12, 13–14, 27–28; see also dkt no. 29 at ¶¶ 43, 47–50, 52–53, 56–61. The plaintiff also claims that Jennifer Coker (Director of Human Resources and Legal Affairs), Shoko Gerritts and David Petty (Corporate Training and Safety Manager) conspired together to have Teresa High (Security Guard) follow the plaintiff throughout his entire shift on March 24, 2016. See Dkt. No. 1 at 17–18, 22–23, 28; see also dkt no. 29 at ¶¶ 18, 62, 83.

IRIS immediately investigated all the plaintiff's complaints. Dkt. No. 29 at ¶18. As part of that investigation, Shoko Gerritts and Coker interviewed several employees, including the plaintiff. Id. Coker also reviewed documents relevant to the plaintiff's allegations. Id. On March 23, 2016, Coker submitted a written report summarizing the findings of the investigation. Id.; Dkt. No. 30-4. The report indicates that IRIS was able to substantiate only the plaintiff's allegation relating to cell phone use by employees on the production floor. Dkt. No. 29 ¶19. No one provided any evidence to corroborate the plaintiff's allegations relating to unlawful discrimination and retaliation. Id. at ¶19.

Specifically, IRIS did not find any evidence to support the plaintiff's allegation that Greene discriminated against him on the basis of his race by failing to select him to train for the Line Lead position. See id. at ¶¶22–39. While the plaintiff alleged that he had more seniority than two employees who were selected to train for Line Lead, IRIS's investigation revealed that there are

a number of factors other than seniority that Greene and other IRIS supervisors and management employees consider when hiring or selecting employees to train for the position, including proficiency with machines, overall job performance, ability to perform certain tasks such as inspections and troubleshooting, communication skills, attendance, leadership and interpersonal skills. Id. at ¶22. As of March 2016, the plaintiff never had asked to train as a Line Lead. Id. at ¶27. Greene also did not select the plaintiff to train for Line Lead because of her observations about how he failed to get along with others. Id. at ¶¶31–32.

While the plaintiff was employed at IRIS, Greene promoted three individuals (two white males and one Hispanic male) to Line Lead; all three individuals had more seniority than the plaintiff. Id. at ¶¶37–38. During that same time, two African Americans were promoted to Line Lead by the first-shift supervisor. Id. at ¶39. And Greene has recommended two African American individuals and one biracial African American individual for promotions to Line Lead positions since the plaintiff's employment was terminated. Id. at ¶¶35–36.

The investigation further revealed that the plaintiff's other complaints lacked merit. All employees interviewed, aside from the plaintiff, explained that they never had heard Greene make racist, sexually explicit or harassing remarks. Id. at ¶41. As to the plaintiff's complaint about being assigned a machine three consecutive days that hurt his hands and fingers, Greene indicated that she regularly assigns employees to work that machine for up to four or five days in a row. Id. at ¶53. The plaintiff did not ask Greene to assign

6

him to a different machine. Id. at ¶55. The investigation also showed that there was no merit to the plaintiff's allegation that Greene retaliated against him by requiring him to change his shirt, because Greene addressed the company's attire policy with all third-shift employees she supervised. Id. at ¶51. Finally, the investigation revealed that Greene approved the plaintiff for the overtime shift once she became aware of it. Id. at ¶43. In fact, the plaintiff earned more overtime pay during the six months after filing the March 2016 grievance than he did during the six months prior thereto. Id. at ¶¶44–45.

Coker informed the plaintiff of the results of the investigation on March 24, 2016, both orally and in writing. Id. ¶¶20–21.

C.    The plaintiff's ongoing complaints and IRIS's investigation

The plaintiff continued to file complaints after IRIS concluded its investigation. In late March, the plaintiff complained that Greene influenced another employee to write a negative incident report about him to Richard Gerritts in retaliation for the plaintiff's March grievance and in order to create "a paper trail" that would eventually be used to justify his termination. See Dkt. No. 1 at 12–13; see also dkt. no. 29 at ¶66. The negative incident report related to an incident between the plaintiff and one of his co-workers, Terrance Mathis. See Dkt. No. 31-1 at 40–42. The plaintiff claimed that Mathis told him that he did not like the grievances the plaintiff was filing. See id. The plaintiff purportedly responded, "If you want to meet somewhere and have coffee and talk about it off company grounds, we can do that." Dkt. No. 29 at ¶67 (quoting Dkt. No. 31-1 at 40). Mathis perceived this response as a threat to fight outside

7

of company property. Id. On being informed about the interaction between the plaintiff and Mathis, Greene told a Line Lead to obtain a written statement from Mathis about the incident. Id. at ¶67. IRIS investigated the plaintiff's complaint and found that it lacked merit because Greene had a responsibility to investigate and document work-related matters. Id. at ¶69. The plaintiff did not receive any written discipline stemming from the Mathis incident. Id. at ¶70.

The plaintiff made two complaints on April 22, 2016. First, he submitted a grievance alleging that a co-worker, Luis Ramos, threatened to write him up and that the threat could have been a "criminal or civil offense." Id. at ¶71; see also dkt. no. 1 at 25–26. IRIS investigated this allegation and learned that the plaintiff had walked underneath a raised forklift as Ramos was operating it, which constituted a violation of the company's safety rules. Id. at ¶72. IRIS concluded that Ramos did not threaten the plaintiff; rather, he was concerned that the plaintiff had committed an unsafe act, and he informed the plaintiff of the dangers and consequences of walking underneath a raised forklift. Id.

Second, the plaintiff complained that his vehicle was scratched and claimed that it happened while parked in the company's lot. Id. at ¶73. IRIS reviewed security footage of its parking lot, but the company did not observe any evidence to suggest that the plaintiff's vehicle was scratched by an IRIS employee. Id. at ¶74. Although the plaintiff initially suggested that Ramos may have been the one who scratched his vehicle, the complaint accuses Greene. See id. at ¶77; see also dkt. no. 1 at 15–16. The plaintiff did not witness the incident, and he admits he has "no real evidence" that Greene did it. Dkt. No.

8

29 at ¶75 (quoting Dkt. No. 31-1 at 6–7). Greene denies scratching the plaintiff's vehicle. Id. at ¶76.

Coker issued the plaintiff a letter dated April 28, 2016, that summarized IRIS's investigation into his latest complaints. See id. at ¶65 (citing Dkt. No. 30-6). Given that only one of the plaintiff's fourteen complaints was substantiated, IRIS concluded that the plaintiff's "actions are intentionally designed to disrupt the work environment." Dkt. No. 29 at ¶78 (quoting Dkt. No. 30-6). The company warned that continuing to make "unsubstantiated, repetitive, and frivolous complaints will lead to disciplinary action." Id.

D.    Escalation of dispute between the plaintiff and Ramos

Over the summer, the dispute between the plaintiff and Ramos escalated. See id. at ¶19. The plaintiff claims that Ramos threw a wooden pallet near him in an intimidating manner in June and plastic dust at him the following month. See Dkt. No. 1 at 25–26. Richard Gerritts investigated both incidents. On reviewing surveillance video of the production floor, he determined that Ramos did not deliberately throw the pallet toward the plaintiff. Dkt. No. 29 at ¶80. Nevertheless, Richard Gerritts verbally reprimanded Ramos for throwing company material. Id. As to the alleged dust throwing, Ramos told Richard Gerritts that he accidentally dropped dust near the plaintiff, which he immediately cleaned up. Id. at ¶81. Ramos also told Richard Gerritts that the plaintiff routinely stared at him during their shift and was trying to provoke him. Because there was no evidence to support either employee's allegations,

9

Richard Gerritts determined that IRIS could not issue formal discipline to either Ramos or the plaintiff. Id. at ¶82.

The plaintiff claims that on August 2, 2016, Ramos taunted him with monkey noises and gestures. See Dkt. No. 1 at 24. Ramos then followed him in a forklift, almost hitting him, jumped off the forklift and rushed to attack him. Id. The two men went "chest to chest," but there was no further physical contact and the plaintiff was not injured as a result of this incident. Dkt. No. 29 at ¶86 (quoting Dkt. No. 31-1 at 48–49). Corporate Training and Safety Manager David Petty investigated the forklift incident by interviewing Ramos and Baird, obtaining written statements from witnesses and reviewing surveillance video. Dkt. No. 29 at ¶83 (citing Dkt. No. 35-1). Ramos told Petty that the plaintiff was provoking him, including calling him a chicken, mocking his haircut and laughing at him. Id. at ¶84. Ramos also told Petty that the incident was triggered by the plaintiff telling him to "fuck off." Id. The plaintiff admitted to Petty that he told Ramos to "act like a man," that he was "acting like a baby" and to "fuck off." Id. at ¶85.

The investigation revealed that both employees bore responsibility for the incident, though Ramos was the aggressor. Id. at ¶83. Petty recommended that Ramos be issued a "final probation" and that the plaintiff be issued a written warning. Id. at ¶87. Coker agreed with Petty's recommendations. Id. at ¶88. On or around August 9, 2016, Ramos received a "Probation Notice" level correction action for aggressively and rapidly confronting the plaintiff, suddenly stopping his forklift in an unsafe manner and inviting the plaintiff to go outside and

10

fight. Id. at ¶73 (citing Dkt. No. 30-7). The plaintiff received a "Written Notice" level corrective action for instigating the confrontation and behaving in an unprofessional manner. Dkt. No. 29 at ¶90 (citing Dkt No. 30-8). Probation is more serious than a Written Notice under IRIS's progressive discipline policy and is the most severe discipline an employee can receive, aside from a suspension without pay. Dkt. No. 29 at ¶91. The Probation Notice left Ramos on the verge of termination. Id. (citing Dkt. No. 30-3).

On August 15, 2016, the plaintiff obtained a temporary restraining order against Ramos. See Dkt. No. 29 at ¶93; see also dkt. no. 38-1 at 2–11. Ramos immediately was transferred to another shift so that he did not work at the same time as the plaintiff. Dkt. No. 29 at ¶93.

E.    The plaintiff's first EEOC charge

Meanwhile, on July 11, 2016, the plaintiff filed his first charge of discrimination with the U.S. Equal Employment Opportunity Commission, alleging that IRIS discriminated against him based on his race and retaliated against him for engaging in protected activity on or about March 19, 2016. Id. at ¶3 (citing Dkt. No. 30-1). Specifically, the plaintiff alleged that (1) he was denied training for a Line Lead position while white employees with less seniority, experience, and education have been trained; (2) his supervisor failed to inform him of overtime opportunities and requests; (3) he was denied a pay increase; and (4) his car was "keyed." Id.

11

F.    The plaitniff's August 2016 allegations

The plaintiff alleges that IRIS continued to retaliate against him throughout August 2016. He claims that Richard Gerritts and Greene worked together to create "a retaliatory paper trail" that could be used to justify the plaintiff's termination, including attempting to have the plaintiff sign false disciplinary documents for his work file. See Dkt. No. 1 at 20–21. He further claims that on August 12, 2016, Greene maliciously changed the speed of one of the three machines he was working on without notice, which caused the machine to overflow with product and forced him to work unnecessarily hard. See id. at 16–17; see also dkt. no. 29 at ¶94. According to Greene, she routinely speeds up machines that Machine Employees are working on without telling them because employees quickly notice any speed changes and are trained to adapt to increased when demand requires. Dkt. No. 29 at ¶95.

G.    The plaintiff's termination

On July 31, 2016, Adonnia Newton (who worked at IRIS through a temporary staffing agency) texted the plaintiff a picture of her sunburned upper back. Id. at ¶ 100 (citing Dkt. No. 32-4). The plaintiff did not tell Newton that he was offended by the picture or that he found the picture inappropriate. Dkt. No. 29 at ¶¶106–07.

On September 20, 2016, the plaintiff filed a grievance alleging that Newton was talking about his criminal history with other employees and had sent him "half naked pictures of her via text" (which the plaintiff later confirmed was the July 31 picture). See Dkt. No. 32-3; see also dkt. no. 29 at

12

¶¶96, 101–03. In the grievance, the plaintiff acknowledged that he had told co-workers that Newton had texted him half-naked pictures. Dkt. No. 32-3 at 2–3; see also dkt. no. 29 at ¶113. The plaintiff also stated that he had attempted to get Newton fired by forwarding the pictures to the manager of the staffing agency through which he thought Newton worked. Dkt. No. 32-3 at 3; see also dkt. no. 29 at ¶¶109–10, 113. Newton did not work for that staffing agency. See Dkt. No. 29 at ¶¶111, 113. Effective September 21, 2016, the plaintiff was placed on paid leave pending investigation into the dispute with Newton. See Dkt. No. 30-9.

IRIS fully investigated the plaintiff's grievance. Dkt. No. 29 at ¶114. As part of that investigation, Coker and Shoko Gerritts interviewed the plaintiff and obtained written statements from Newton and a witness named Rebecca Prohaska. Id. The investigation revealed that Newton had inappropriately gossiped in the workplace about the plaintiff's background. Id. at ¶118. As a result, IRIS directed the temporary staffing agency to end Newton's assignment at IRIS. Id. However, the investigation also revealed that (1) the plaintiff had lied about the number and type of pictures that Newton sent him in an effort to shame her within the workplace; (2) the plaintiff acted recklessly in sending the pictures to a temporary staffing agency without knowing whether that agency actually employed Newton; and (3) the plaintiff's motivation was to cause Newton to lose her employment in retaliation for her comments about his personal life. Id. at ¶116.

13

Given his actions concerning Newton and his prior discipline, IRIS terminated the plaintiff's employment on October 14, 2016. Id. at ¶117 (citing Dkt. No. 30-10). Coker issued the plaintiff a termination letter, which indicated that IRIS's "investigation revealed that [the plaintiff] engaged in a variety of misconducts relating to [his] allegations against Adonnia Newton," including "making false statements about Ms. Newton to coworkers and inappropriately sharing photos of Ms. Newton." Dkt. No. 29 at ¶119 (quoting Dkt. No. 30-10). The letter further indicated that the plaintiff "admitted that [he] engaged in this conduct in retaliation for statements that Ms. Newton had made in the workplace." Id.

      H.     The plaintiff's second EEOC charge

In December 2016, the plaintiff filed another charge of discrimination with the EEOC. Dkt. No. 29 at ¶4 (citing Dkt. No. 30-2). The plaintiff alleged that IRIS subjected him to harassment and disciplinary action after he filed his first EEOC charge. Id. He also explained that IRIS terminated his employment on October 14, 2016. Id.

## II.    Procedural Background

On June 13, 2018, the plaintiff filed a thirty-five-page complaint in this court against IRIS and ten of its employees, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. See Dkt. No. 1. The case randomly was assigned to U.S. Magistrate Judge David E. Jones. When screening the complaint under 28 U.S.C. §1915, Judge Jones dismissed the individual defendants but allowed the plaintiff to proceed on his claims

14

against IRIS. <u>See</u> Dkt. No. 4. In lieu of an answer, IRIS filed a motion for a more definite statement under Fed. R. Civ. P. 12(e). Dkt. No. 8. Judge Jones denied that motion and indicated that IRIS could answer or file a general denial. <u>See</u> Dkt. No. 13. IRIS filed its answer on November 16, 2018. Dkt. No. 15. The parties took extensive discovery, and Judge Jones presided over several discovery-related hearings. <u>See</u> Dkt. Nos. 16, 17, 19–25. On June 4, 2019, IRIS filed this motion for summary judgment on all of Baird's claims. <u>See</u> Dkt. No. 27. That motion is fully briefed. <u>See</u> Dkt. Nos. 28, 40, 42.[2]

## III.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

---

[2] Despite several extensions of time, the plaintiff filed his materials opposing summary judgment a few days late.

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV. Discussion

The complaint contains twenty-three separate "counts" alleging a wide range of actions by IRIS employees that the plaintiff claims amounted to racial discrimination or retaliation. IRIS argues that many counts exceed the scope of the plaintiff's EEOC charges, that other counts fail to allege materially adverse actions and that the remaining counts are either time-barred or fail on their merits. The plaintiff did not respond to the substance of any of IRIS's arguments. See Dkt. No. 40. His opposition brief largely contains irrelevant and

16

conclusory assertions of fact. The plaintiff's failure to address with the substantive law at issue is reason to grant IRIS's motion. See Greer v. Bd. of Educ., 267 F.3d 723, (7th Cir. 2001) (finding that district court would have been justified in granting defendant's motion for summary judgment based on plaintiff's failure to sufficiently respond to defendant's proposed facts and "use[ of] a 16-page brief as a veritable catapult to hurl a jumbled mass of information . . . at [defendant] and the district court in the hope of avoiding summary judgment"). But because the plaintiff is representing himself, and out of an abundance of caution, the court will address IRIS's arguments.

A.    The plaintiff's allegations concerning Knue are untimely

"A plaintiff must file a charge of discrimination with an appropriate agency before [he] can file a lawsuit invoking the protections of Title VII." Majors v. GE, 714 F.3d 527, 536 (7th Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1); Laouini v. CLM Freight Lines, Inc., 586 F.3d 473, 475 (7th Cir. 2009)). "In Wisconsin, a plaintiff has 300 days from the alleged discriminatory act to file a complaint with the EEOC or the state Equal Rights Division." Calvin v. Sub-Zero Freezer, Co., 697 F. App'x 874, 875 (7th Cir. 2017) (citing § 2000e-5(e); Johnson v. J.B. Hunt Transp., Inc., 280 F.3d 1125, 1128–29 (7th Cir. 2002)). "A plaintiff's failure to file a timely administrative complaint bars his suit." Calvin, 697 F. App'x at 875 (citing Salas v. Wis. Dep't of Corr., 493 F.3d 913, 921 (7th Cir. 2007)).

The plaintiff began working at IRIS in June 2015. He alleges that Knue called him "Hershey" during his first week on the job. See Dkt. No. 1 at 4. The

17

plaintiff did not file his first charge with the EEOC until July 11, 2016—over 365 days later. See Dkt. No. 30-1. Because more than 300 days passed between the alleged discriminatory comment and the plaintiff's filing of an administrative complaint, the plaintiff's allegations against Knue are time-barred.

B.     Many of the plaintiff's allegations exceed the scope of his EEOC charges

The plaintiff filed two charges with the EEOC: one in July 2016 and the other in December 2016. The first EEOC charge alleges four specific instances of discrimination: (1) the plaintiff was denied opportunities to train for a Line Lead position; (2) the plaintiff's supervisor failed to inform him of overtime opportunities and requests; (3) the plaintiff was denied a pay increase; and (4) the plaintiff's car was "keyed." See Dkt. No. 30-1. The second EEOC charge alleges that the plaintiff was harassed and subjected to disciplinary action in retaliation for filing the first EEOC charge. See Dkt. No. 30-2.

"Generally, 'a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [his] EEOC charge.'" Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 634 (7th Cir. 2013) (quoting Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)). "This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion and of giving the employe[r] some warning of the conduct about which the employee is aggrieved." Cheek, 31 F.3d at 500 (citations omitted). Requiring Title VII plaintiffs to exhaust their administrative remedies is a condition precedent to filing a federal lawsuit. Cheek, 31 F.3d at

18

500 (citing <u>Babrocky v. Jewel Food Co.</u>, 773 F.2d 857, 864 (7th Cir. 1985)). "For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." <u>Cheek</u>, 31 F.3d at 500.

"[A] Title VII plaintiff," however, "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in [his] complaint." <u>Id.</u> (citing <u>Taylor v. W. & S. Life Ins. Co.</u>, 966 F.2d 1188, 1195 (7th Cir. 1992)). Rather, "a plaintiff can still bring [claims not included in the EEOC charge] if they are 'like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations.'" <u>Lavalais</u>, 734 F.3d at 634 (quoting <u>Moore v. Vital Prods., Inc.</u>, 641 F.3d 253, 256–57 (7th Cir. 2011)). "To be 'like or reasonably related,' the relevant claim and the EEOC charge 'must, at minimum, describe the *same conduct* and implicate the *same individuals*.'" <u>Moore</u>, 641 F.3d at 257 (quoting <u>Cheek</u>, 31 F.3d at 501).

Because the second EEOC charge alleges retaliation based on filing the first charge, any allegations of mistreatment suffered by the plaintiff before July 11, 2016—the day he filed the first charge—are exhausted only if the plaintiff raised them in the first charge or if they are like or reasonably related to those allegations. In his complaint, the plaintiff alleges several instances of discrimination that pre-date his first EEOC charge and that are not contained in that charge. These include:

19

- Greene-2: assigning the plaintiff to a machine that caused severe pain in his hands and fingers on March 15, 16, and 17, 2016

- Greene-3: requiring the plaintiff to change his shirt on March 16, 2016

- Greene-5: telling a Line Lead to obtain a written statement from Mathis regarding his alleged incident with the plaintiff on March 30, 2016

- Greene-6: giving the plaintiff a negative performance evaluation on March 16, 2016

- Coker-1, Shoko Gerritts-1, and Petty-1: directing a security guard to follow the plaintiff during his shift on March 24, 2016

- High-1: following the plaintiff during his shift on March 24, 2016

- Smith-1: following the plaintiff during his shift, writing a negative supervisory report, and threatening to call Richard Gerritts on March 13, 2016

- Knue-1: referring to the plaintiff as "Hershey" in June 2015

- Coker-4: warning the plaintiff on April 28, 2016, that he would be disciplined if he continued to file unsubstantiated complaints[3]

---

[3] The plaintiff alleges that Coker's warning violated his First Amendment right to free speech. See Dkt. No. 1 at 31–32 [Coker-4]. Not only is this allegation outside the scope of the EEOC charges, but it fails as a matter of law because the plaintiff has not presented any evidence that IRIS, a private employer, engaged in state action. See Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1988) ("The First Amendment retaliation concept applies only to public employment, since private employers are not subject to the amendment.").

These allegations are not like or reasonably related to the specific allegations of misconduct contained in the first charge, because they describe different conduct and, at times, different individuals. The court must dismiss them.

C.  IRIS is entitled to summary judgment with respect to the plaintiff's disparate treatment allegations

1.  *Applicable law*

"Title VII prohibits employers from discriminating based on 'race, color, religion, sex, or national origin.'" Morgan v. SVT, LLC, 724 F.3d 990, 995 (7th Cir. 2013) (quoting 42 U.S.C. § 2000e-2(a)). In Ortiz v. Werner Enters., Inc., 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit clarified that the appropriate inquiry in a Title VII race discrimination case is whether, when considering the evidence as a whole, a reasonable factfinder could conclude that the employee's race caused the adverse employment action. See Johnson v. Advocate Health & Hosps. Corp., 892 F.3d 887, 894 (7th Cir. 2018) (citing Ortiz, 834 F.3d at 765).

"Despite doing away with the need for separate tests and 'mosaics,' the well-known and oft-used McDonnell Douglas[4] framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." Johnson, 892 F.3d at 894 (citing David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508, 846 F.3d 216, 224 (7th Cir. 2017)). Under that framework, the plaintiff must present evidence that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate expectations, (3) he suffered an adverse employment action and (4) similarly

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

situated employees outside of his protected class were treated more favorably. See Fields v. Bd. of Educ., 928 F.3d 622, 626 (7th Cir. 2019) (citing Oliver v. Joint Logistics Managers, Inc., 893 F.3d 408, 412 (7th Cir. 2018)). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." David, 847 F.3d at 225 (quoting Andrews v. CBOCS West, Inc., 743 F.3d 230, 234 (7th Cir. 2014)).

        2.    *Analysis*

The plaintiff alleges that, from October 2015 through October 2016, Greene refused to promote him because he is African American. See Dkt. No. 1 at 8–10 [Greene-1]. The plaintiff has not submitted any evidence to support this allegation. The undisputed facts show that all three individuals promoted to Line Lead by Greene during the plaintiff's time at IRIS had more seniority than him and that seniority was only one factor considered by IRIS in determining whom to promote. See Dkt. No. 29 at ¶¶22, 37–38. The plaintiff has failed to meet his initial burden of showing that similarly situated non-African Americans were promoted over him. See Formella v. Brennan, 817 F.3d 503, 512 (7th Cir. 2016) (quoting Good v. Univ. of Chi. Med. Ctr., 673 F.3d 670, 675 (7th Cir. 2012)) ("Similarly situated employees must be directly comparable to the plaintiff in all material respects.").

Even if the plaintiff had presented evidence to make his *prima facie* case, the undisputed facts show that IRIS had legitimate, nondiscriminatory reasons

for not promoting him, and the plaintiff has failed to establish that those reasons were pretextual. In addition to selecting more experienced employees, Greene did not select the plaintiff to train for a Line Lead position because he never requested her to do so and because of her observations about how he failed to get along with others. See Dkt. No. 29 at ¶¶27, 31–33. Although the plaintiff asserts that he was a better worker and had a higher level of education than the employees promoted over him, see dkt. no. 1 at 5, his subjective belief that he was a better candidate, without more, is not enough to establish pretext. See Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001).

The plaintiff's other pretext arguments also are unpersuasive. The plaintiff asserts, without any admissible supporting evidence, that all employees promoted during his time at IRIS were white. See Dkt. No. 1 at 5, 8–9; see also dkt. no. 40 at 4–5. In fact, in the approximately sixteen months that the plaintiff worked at IRIS, Greene promoted three individuals to the Line Lead position, including one Hispanic, and the first-shift supervisor promoted two African Americans to Line Lead positions. See Dkt. No. 29 at ¶¶ 37, 39.[5]

The plaintiff also asserts that Greene "made statements showing her mind state of not promoting African Americans." See Dkt. No. 1 at 9. He cites two examples. First, in October 2015 Greene allegedly told the plaintiff that African Americans "are more difficult to control than Caucasians or Hispanics."

_____

[5] Greene also recommended two African American individuals and one biracial African American individual for promotions Line Lead positions after the plaintiff's employments with IRIS ended. See Dkt. No. 29 at ¶¶35–36.

Id. Second, on March 9, 2016, Greene allegedly made "statements [in the plaintiff's presence] showing she thinks that African Americans are more prone to violence than Caucasians." Id. Assuming Greene made the statements that the plaintiff attributes to her, there is no evidence that they were made in the context of her promotion decisions. Isolated comments unconnected to the adverse employment action are not probative of discrimination. See Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) (citation omitted) (finding that isolated comments are probative of discrimination only when they are contemporaneous with or causally related to the decision-making process leading to the adverse action).

Accordingly, IRIS is entitled to summary judgment on the plaintiff's failure-to-promote claim.

D.    IRIS is entitled to summary judgment with respect to Baird's retaliation allegations

1.    *Applicable law*

In addition to direct discrimination, Title VII proscribes discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To survive summary judgment on a Title VII retaliation claim, a plaintiff must produce "evidence that would permit a reasonable factfinder to conclude that [his] engagement in protected activity caused a materially adverse employment action." Fields, 928 F.3d at 626 (citing Madlock v. WEC Energy Group, Inc., 885 F.3d 465, 472 (7th Cir. 2018); Lauth v. Covance, Inc., 863 F.3d 708, 716 (7th Cir. 2017)).

"In the retaliation context, determining whether an action is materially adverse means inquiring whether it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Boss v. Castro, 816 F.3d 910, 918 (7th Cir. 2016) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). "Because Title VII does not set forth a general civility code for the American workplace, its anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners." Id. "An employee must suffer something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Boss, 816 F.3d at 918–19 (quoting Hobbs v. City of Chi., 573 F.3d 454, 463–64 (7th Cir. 2009)).

2.    *Analysis*

Most of the plaintiff's allegations are insufficient to meet the anti-retaliation's "materially adverse action" standard. These include:

- Greene-2: assigning the plaintiff to a machine that caused severe pain in his hands and fingers

- Greene-3: requiring the plaintiff to change his shirt

- Greene-5: telling a Line Lead to obtain a written statement from Mathis regarding his alleged incident with the plaintiff

- Greene-6: giving the plaintiff a negative performance evaluation

- Greene-8: scratching the passenger-side of the plaintiff's vehicle while it was parked in IRIS's lot[6]

- Greene-9: increasing the speed of the plaintiff's machine without telling him

---

[6] Greene denied scratching the plaintiff's vehicle, and the plaintiff admits that he has no evidence she did it. See Dkt. No. 19 at ¶¶75–76.

25

- Coker-1, Shoko Gerritts-1, and Petty-1: directing a security guard to follow the plaintiff during his shift

- High-1: following the plaintiff during his shift

- Richard Gerritts-1: attempting to have the plaintiff sign false disciplinary documents

- Petty-2: convincing a police officer not to view surveillance video of the forklift incident involving the plaintiff and Ramos

- Smith-1: following the plaintiff during his shift, writing a negative supervisory report, and threatening to call Richard Gerritts and have the plaintiff fired

These alleged incidents, while arguably unpleasant or annoying, did not result in any tangible job consequences for the plaintiff. The plaintiff has failed to present a genuine issue of fact that these incidents might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

The plaintiff alleges that, after he filed his grievance against Greene, she stopped informing him about potential overtime opportunities from Clara in shipping [Greene-4, Doe-1] and began assigning another overtime shift to a different employee [Greene-7]. See Dkt. No. 1 at 11–12, 14–15, 27–28. Both claims fail as a matter of law. The undisputed facts show that the plaintiff continued to perform significant overtime work for IRIS after filing his grievance in March 2016, earning more overtime pay from April through September 2016 than he did from September 2015 to February 2016. See Dkt. No. 29 at ¶¶43–45. No reasonable factfinder could conclude that the plaintiff was denied overtime pay or overtime opportunities in retaliation for engaging in protected activity. See, e.g., Latham v. Donahue, 40 F. Supp. 3d 1023, (N.D. Ill. 2014)

26

(citing <u>Jordan v. Chertoff</u>, 224 F. App'x 499, 502 (7th Cir. 2006)) ("[T]he Seventh Circuit has held that when an employee was given overtime at the discretion of her supervisor, the temporary loss of overtime did not constitute an adverse employment action.").

The plaintiff further alleges that IRIS terminated his employment in retaliation for complaining about racial discrimination. Specifically, he claims that after he filed his grievance against Greene, IRIS began creating a "paper trail" that the company could use to justify his termination and engaged in "numerous instances of retaliatory acts" in hopes of provoking him to commit a fireable offense. <u>See</u> Dkt. No. 1 at 19–20 [Coker-3]. Also, as part of the retaliatory scheme, in April 2016 IRIS "threatened" to terminate the plaintiff's employment if he filed any more grievances. <u>See</u> <u>id.</u> at 31–32 [Coker-4]. According to the plaintiff, IRIS relied on the April warning letter when the company fired him nearly six months later after he filed a grievance complaining about being "slandered" at work by one of his co-workers. <u>See</u> <u>id.</u> at 19–20, 31–32.

The plaintiff's retaliatory discharge claim fails to the extent he claims he was fired for his grievance against Newton. The plaintiff admits that he filed the grievance against Newton because she had told other IRIS employees about his past criminal activity. Because the grievance did not relate to discrimination (or any other protected characteristic), the plaintiff was not opposing conduct prohibited by Title VII when he complained to IRIS about Newton. <u>See</u> <u>Gleason v. Mesirow Fin.</u>, 118 F.3d 1134, 1146–47 (7th Cir. 1997).

27

The plaintiff also has failed to present sufficient evidence from which a reasonable factfinder could conclude that he was terminated for engaging in legitimate protected activity. The undisputed facts show that he was fired for legitimate, nonretaliatory reasons. The plaintiff admitted that he maliciously retaliated against Newton, including exaggerating about the picture she had sent to him months earlier and attempting to get her fired after she gossiped about his background in the workplace. See Dkt. No. 29 at ¶¶114, 116. The October 14, 2016 termination letter explained that, combined with his prior misconduct, the plaintiff's actions relating to Newton—that is, telling co-workers that Newton had sent him "half naked" pictures and forwarding a picture to the staffing agency he erroneously believed employed Newton—were grounds for termination. See Dkt. No. 10-10; see also dkt. no. 29 at ¶¶96–119. The plaintiff has not presented any evidence suggesting that those reasons were pretextual.[7] See Timm v. Ill. Dep't of Corrs., 335 F. App'x 637, 643–44 (7th Cir. 2009) (affirming summary judgment in favor of employer because Plaintiff "did not present any evidence . . . showing that the [employer's] explanation for his discharge was dishonest or that the [employer] really did not believe that his actions constituted inexcusable negligence").

---

[7] To the extent the plaintiff seeks to raise a disparate treatment claim related to his termination, it fails for the same reasons as his retaliatory discharge claim. Given his confrontations at work, his pattern of filing frivolous complaints and his malicious behavior toward Newton, the plaintiff also has failed to show that he was meeting IRIS's legitimate expectations. Nor has he shown that he was treated less favorably than similarly situated white employees; indeed, Newton's temporary assignment at IRIS was terminated for her role in the incident.

IRIS is entitled to summary judgment on Baird's retaliation claims.

E.    IRIS is entitled to summary judgment with respect to Baird's hostile work environment allegations

1.    *Applicable law*

"[I]n addition to prohibiting discrimination that has direct economic consequences," Title VII "forbids employers from requiring people to work in a discriminatorily hostile or abusive environment." Boss, 816 F.3d at 919–20 (citing Vance v. Ball State Univ.,133 S. Ct. 2434, 2440–41 (2013); Nichols v. Mich. City Plant Planning Dep't, 755 F.3d 594, 600 (7th Cir. 2014)). A hostile work environment exists "[w]hen 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" Alexander v. Casino Queen, Inc., 739 F.3d 972, 982 (7th Cir. 2014) (quoting Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir. 2005)).

"Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." Boss, 816 F.3d at 920 (citing Nichols, 755 F.3d at 600). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it

29

unreasonably interferes with the employee's work performance." <u>Boss</u>, 816 F.3d at 920 (citing <u>Alexander</u>, 739 F.3d at 982). Reviewing courts must "consider the hostile work environment claim under a 'totality of the circumstances' approach." <u>Boss</u>, 816 F.3d at 920 (citations omitted).

        2.    *Analysis*

Though it is not clear from the plaintiff's filings, it appears that he is claiming that IRIS created a hostile environment based on his race and in retaliation for complaining about race discrimination. The only evidence the plaintiff has presented hinting at a racial animus is Greene's alleged racially offensive statements. The first, about African American men being too difficult to control, allegedly was made in October 2015 in reference to Greene's dating life. <u>See</u> Dkt. No. 29 at ¶40. The other statement was purportedly made in March 2016, when Greene allegedly implied that a workplace dispute between the plaintiff and a white co-worker would have resulted in a fight if the co-worker had been African American. <u>See</u> <u>id.</u> Even if Greene made these statements, nearly five months passed between them, and neither statement was directed at the plaintiff and his race. These stray remarks were not so severe or persuasive as to create a hostile work environment.

Regarding potential retaliatory hostile work environment, the plaintiff alleges that Coker, Richard Gerritts and Ramos schemed to harass him after he filed his March 2016 grievance against Greene. <u>See</u> Dkt. No. 1 at 18–19 [Coker-2], 21 [Richard Gerritts-2], and 25–27 [Ramos-1]. According to the plaintiff, Coker encouraged Ramos to engage in a series of acts that were designed to get

30

the plaintiff to quit his job or react in a way that would justify his termination. These alleged acts include Ramos threatening to write up the plaintiff for a safety violation in April, Ramos throwing a wooden pallet near the plaintiff in June, Ramos throwing plastic dust at the plaintiff in July and Ramos taunting and "attacking" the plaintiff in August. The plaintiff alleges that Coker and Richard Gerritts refused to discipline Ramos for any of these incidents, which led to the plaintiff having to obtain a restraining order against Ramos. The plaintiff further alleges that Ramos's intimidating behavior eventually led to his unjust termination.

The retaliatory hostile work environment claim fails for several reasons. First, the plaintiff has not presented any evidence to show that Ramos was motivated by the plaintiff's alleged protected activity, rather than simple dislike. The plaintiff claims that Coker put Ramos up to the task but presents no evidence to support this allegation. Second, the incidents involving Ramos were not severe or pervasive. The four alleged incidents were brief interactions transpiring over the course of several months. No reasonable factfinder could conclude that these incidents created an abusive environment that interfered with the plaintiff's work performance. Aside from the last incident—when Ramos went chest-to-chest with the plaintiff and challenged him to a fight—the dispute did not involve any physical contact or threats.

Finally, the plaintiff has not demonstrated that IRIS should be held accountable for Ramos's actions. "[A]n employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's

supervisor only where the plaintiff proves that the employer has 'been negligent either in discovering or remedying the harassment.'" See Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505–06 (7th Cir. 2004) (quoting Parkins v. Civil Constrs. of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998)). The undisputed facts show that IRIS investigated the alleged incidents and imposed discipline when warranted.

Specifically, the company determined that: (1) no discipline was warranted for the April incident because Ramos merely expressed a legitimate concern about the plaintiff walking underneath a raised forklift; (2) no formal discipline was warranted for the June incident because surveillance video showed that Ramos did not deliberately throw the pallet toward the plaintiff, yet Richard Gerritts verbally reprimanded Ramos for throwing company material; (3) it could not discipline either employee for the July incident because no evidence corroborated either employee's version of events; and (4) Ramos deserved to be harshly punished for the August incident because he was the aggressor and Ramos received a Probation Notice, while the plaintiff received only a verbal warning. Given these undisputed facts, no reasonable factfinder could conclude that IRIS was negligent in its handling of the incidents involving Ramos.

IRIS is entitled to summary judgment on Baird's hostile work environment claims.

32

## V.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 27.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. <u>See</u> Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the

judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 25th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**